**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

B. Bros. Packaging, Inc. d/b/a Fox Packaging Co., a Minnesota corporation, and Fox Packaging of New England, LLC, a Minnesota Limited Liability Company,

Plaintiffs,

v.

South/Win Ltd., a North Carolina corporation, William H. DuBose, and Blaine DuBose,

Defendants.

Civil File No. 01-955 (RHK/JMM)

**MEMORANDUM OPINION AND ORDER**

---

Kenneth Dodge, Meagher & Geer, Minneapolis, Minnesota, for Plaintiffs.

C. Blain Harstad and Kacy Kleinhans, Gray Plant Mooty Mooty & Bennett, Minneapolis, Minnesota, for Defendants.

---

This matter is before the Court on Defendant South/Win Ltd.'s ("South/Win") Motion for a Preliminary Injunction. For the following reasons, the Court grants Defendant's motion.

**Background**

Defendant South/Win is a North Carolina corporation in the business of manufacturing, marketing, and selling windshield wiper fluid. (Aff. of William DuBose ("DuBose Aff.") ¶ 2.) South/Win's headquarters and sole manufacturing plant are located in North Carolina. (Compl. ¶ 10.) Defendant William H. DuBose is the President of



FILED DEC 1 8 2001
RICHARD D. SLETTEN, CLERK
JUDGMENT ENTD________
DEPUTY CLERK________

South/Win. (DuBose Aff. ¶ 1.) Defendant Blaine DuBose is a shareholder and officer of South/Win. (Answer ¶ 4.) Plaintiff B. Bros. Packaging, Inc., d/b/a Fox Packaging Co., ("B. Bros.") is a Minnesota corporation with a manufacturing plant in Minnesota, and Fox Packaging of New England, LLC ("Fox Packaging") is a Minnesota limited liability company with a manufacturing plant in Massachusetts. (Aff. of Elliot Badzin ("Badzin Aff.") ¶ 2.) B. Bros. and Fox Packaging, who will be referred to collectively as "Fox," are engaged primarily in the business of manufacturing, packaging, and selling windshield wiper fluid, RV antifreeze, and related products. (Badzin Aff. ¶3.)

South/Win began manufacturing windshield wiper fluid in 1987. (DuBose Aff. ¶ 2.) In 1994, it created the mark "SLUG-A-BUG" for windshield wiper fluid designed for warm weather. (Id. ¶ 3). Since 1994, South/Win has marketed and sold "SLUG-A-BUG" windshield wiper fluid to retailers across the country, both directly and through licensees. (Id. ¶ 5.) These retailers include Wal-Mart, Advanced Auto Stores, Target, and Pep Boys. (Id.)

In late 1995, South/Win and Fox entered into an oral, joint marketing arrangement. (DuBose Aff. ¶ 6; Badzin Aff. ¶¶ 4-5.) As part of this arrangement, South/Win and Fox agreed to work together to make joint sale proposals to Wal-Mart and other national retailers. (Badzin Aff. ¶ 5a.) South/Win and Fox agreed that each party would ship windshield wiper fluid from their respective plants to the retailer's distribution centers to minimize costs. (Id. ¶ 5b.) Billing and processing of orders, however, would be done by

only one of the two companies, which would then remit the funds collected for the other party minus a processing charge. (Id. ¶ 5c-d.) Thus for Wal-Mart, South/Win billed and processed all Wal-Mart orders. (Id.) South/Win would then remit funds collected from Wal-Mart to Fox as payment for shipments made by Fox. (Id.)

During a meeting in early 1997 between the President of South/Win, William DuBose, and the President of B. Bros./CEO of Fox Packaging, Elliot Badzin, DuBose and Badzin agreed that Fox would begin using the phrase "SLUG-A-BUG" on its windshield wiper fluid. (Badzin Aff. ¶ 8; DuBose Aff. ¶ 7.) The parties, however, dispute how this occurred. South/Win contends that Fox requested to use the phrase. (DuBose Aff. ¶ 7.) It claims that it expressly limited the use of the phrase to warm-weather windshield wiper fluid and discussed the proper formula for the fluid with Fox. (Id.) South/Win further contends that it told Fox that it claimed trademark rights in the phrase and that Fox was only permitted to use the phrase while they were working together pursuant to the joint marketing arrangement. (Id. ¶ 8.) Fox, on the other hand, contends that South/Win proposed that Fox use the phrase "SLUG-A-BUG" for its windshield wiper fluid and denies that South/Win claimed trademark rights in the phrase. (Badzin Aff. ¶ 8.) Fox further contends that South/Win placed no conditions on Fox's use of the phrase. (Id.) From 1997 to the summer of 2001, both South/Win and Fox marketed and sold windshield wiper fluid with the "SLUG-A-BUG" mark. (Badzin Aff. ¶ 9; DuBose Aff. ¶ 4.) Fox contends that, during this time, South/Win never objected to Fox's use of the

phrase, never claimed that the phrase was protected by a trademark, and never attempted to supervise Fox's production of windshield wiper fluid sold under the mark. (Badzin Aff. ¶ 9.) Fox further contends that during this time period it expended significant sums of money advertising "SLUG-A-BUG" windshield wiper fluid. (Badzin Aff. ¶ 14.)

On February 22, 2001, South/Win sent Fox a letter stating that it would cease placing orders for windshield wiper fluid with Fox for Wal-Mart effective March 23, 2001. (DuBose Aff. ¶ 9, Exh. A.) Fox continued to market windshield wiper fluid under the "SLUG-A-BUG" label. (Supplemental Aff. of Kacy Kleinhans ¶ 4, Exh. A.) On May 30, 2001, Fox initiated this lawsuit claiming that South/Win owed it over three million dollars for products, including but not limited to windshield wiper fluid, that it shipped on behalf of South/Win. (DuBose Aff. ¶ 12; Compl.)

On July 4, 2001, South/Win sent Fox a letter demanding that Fox stop using the phrase "SLUG-A-BUG." (Aff. of Kacy F. Kleinhans ¶ 2, Exh. A.) Five days later, South/Win served and filed an Answer and Counterclaim in this matter. (Aff. of Kristine M. Boylan ¶ 3, Exh. B.) In the Counterclaim, South/Win asserted a number of claims against Fox, including a claim for trademark infringement. (Id.)

Fox contends that, as of September 20, 2001, it had windshield wiper fluid inventory worth approximately $121,000 and approximately $4,000 in labels bearing the "SLUG-A-BUG" mark. (Badzin Aff. ¶ 17.) South/Win contends that documents it has obtained in discovery show that Fox has approximately $20,000 in inventory bearing the

"SLUG-A-BUG" mark. (Supplemental Aff. of Kacy Kleinhans ¶ 5.)

## Analysis

South/Win moves the Court for an Order: (1) enjoining Fox from using the mark in connection with the sale of windshield washer fluid, (2) directing Fox to destroy all labels bearing the mark, (3) enjoining Fox from selling any goods already bearing the mark, (4) directing Fox to recall all goods bearing the mark sold after March 23, 2001, and (5) awarding South/Win costs and attorney's fees in connection with this motion.

In the Eighth Circuit, the decision of whether to grant a preliminary injunction is judged according to the following four factor test:

1. the existence of a threat of irreparable harm to the movant;
2. the balance between that harm and any injury inflicted on the non-moving party;
3. the movant's probable success on the merits; and
4. the public interest.

Dataphase Systems, Inc. v. CL Systems, Inc., 640 F.2d 109, 114 (8th Cir. 1981). Since the third factor, probable success on the merits, is frequently considered the most important, the Court addresses this factor first. S & M Constructors, Inc. v. Foley Co., 959 F.2d 97, 98 (8th Cir. 1982).

### A. Probability of Success on the Merits

Since South/Win does not have a federally registered trademark, which would be prima facie evidence of a valid trademark, 15 U.S.C. § 1115(a), it must rely on "its common law trademark rights as enforced under the Lanham Act." National Assoc. for

Healthcare Comm., Inc. v. Central Ark. Area Agency on Aging, Inc., 257 F.3d 732, 733 (8th Cir. 2001). The Eighth Circuit has developed a two-step test for determining whether an unregistered mark has been infringed. Yarmuth-Dion, Inc. v. D'ion Furs, Inc., 835 F.2d 990, 992 (8th Cir. 1987). First, the moving party must demonstrate that its mark merits protection under the Lanham Act and, second, the moving party must establish the likelihood of confusion, that is, "that an appreciable number of ordinarily prudent purchasers are likely to be misled, or indeed simply confused, as to the source of the goods in question." Id. at 993.

### 1. Validity of the Mark

Under the Lanham Act, "a common-law trademark arises from the adoption and actual use of a word, phrase, logo, or other device to identify goods or services with a particular party." First Bank v. First Bank Serv., Inc., 84 F.3d 1040, 1044 (8th Cir. 1996). To establish a valid common law trademark, South/Win must come forward with evidence tending to show: (1) that South/Win actually used the term "SLUG-A-BUG" in the relevant market, the geographic area in which Fox sells windshield wiper fluid; and (2) that the term "SLUG-A-BUG" identified South/Win as the provider of that product in the minds of customers. See id.

#### a. Use of Term "SLUG-A-BUG" in the Relevant Market

Neither party has clearly indicated to the Court where and when they sold their respective products. South/Win contends that it has sold its product "on a national basis

every year since 1994 through direct sales and through sales by licensees." (DuBose Aff. ¶ 4.) Fox disputes South/Win's claim and contends that South/Win sold its product only on the East Coast, not in the Midwest or Western United States. (Badzin Aff. ¶ 15(a).) Even if South/Win, itself, had not used the mark in Fox's geographic market prior to their joint marketing agreement, however, South/Win still has priority in that area as Fox was clearly acting with South/Win's approval when it used the mark under the joint marketing agreement. See 15 U.S.C. § 1055; National Assoc. for HeathCare Comm., 257 F.3d at 735. The first prong of the First Bank test, use of the mark in the relevant market, has been satisfied.

**b. Identification of South/Win as Provider of "SLUG-A-BUG"**

To qualify for trademark protection, "SLUG-A-BUG" must distinctly identify South/Win as the provider of the windshield wiper fluid in the minds of customers. The relevant customers are the large corporate retailers like Wal-Mart and Target. (Badzin Aff. ¶ 16.) They are sophisticated buyers who know where their products come from and the marks used by their suppliers. (Id.) These consumers are likely to identify South/Win as the provider of the windshield washer fluid.

**2. Likelihood of Confusion**

The second element of a trademark infringement claim is whether there is a likelihood of confusion caused by the competing mark. WSM, Inc. v. Hilton, 724 F.2d

1320, 1329 (8th Cir. 1984). "Actual confusion is not essential. However, there must be a substantial likelihood that the public will be confused." Id.

The Eighth Circuit has established a six-prong test for determining whether confusion is likely:

> (1) the strength of the infringed mark; (2) whether the marks, examined as a whole, are similar; (3) the degree to which the products compete with each other; (4) intent on the part of the alleged infringer to pass off its goods as the product of another; (5) evidence of actual confusion; and (6) whether the kind of product, its costs and conditions of purchase, allow the purchaser to eliminate the likelihood of confusion which would otherwise exist.

Aveda Corp. v. Evita Mktg., Inc., 706 F. Supp. 1419, 1428 (D. Minn. 1989). These factors are frequently referred to as the "digits of confusion." American Dairy Queen Corp. v. New Line Prod., Inc., 35 F. Supp. 2d 727, 730 (D. Minn. 1998). No single digit is dispositive and several should be weighed in making a determination. General Mills, Inc. v. Kellogg Co., 824 F.2d 622, 625 (8th Cir. 1987).

South/Win contends that this six-part analysis is not necessary and that the Court may rule as a matter of law that "when a former licensee continues to use a mark after its license [is] terminated that such continued use constitutes trademark infringement." (South/Win's Reply Mem. p. 9.) In support of this proposition, South/Win cites to Downtowner/Passport Int'l Hotel v. Norlew, Inc., 841 F.2d 214 (8th Cir. 1988). In Downtowner, the Eighth Circuit merely held that, when a former licensee continues to

use a mark after its license is terminated, it lessens the "quantum of proof necessary to establish a likelihood of confusion." Id. at 219. The Court, therefore, considers each of the "digits of confusion" in turn.

**a. Strength of South/Win's Mark**

Two factors determine the strength of a mark: "the distinctiveness of the mark and the extent to which the mark is recognized by the relevant consumer class." Aveda, 706 F. Supp. at 1428. Neither party contends that the mark is not distinctive, and after reviewing the mark, the Court concludes that it is distinctive.

The Court has previously determined that the relevant consumer class in this case is comprised of large corporate retail stores. South/Win contends that the Court must look past the initial purchaser and evaluate the confusion of suppliers, post-sale users, consumers, and others. The Court rejects this approach because it makes the limiting phrase, "relevant consumer class," in the Eighth Circuit test, meaningless.

The Court concludes that the mark is strong because it is distinctive and recognized by the relevant consumer class. This determination favors a finding of a likelihood of confusion.

**b. Similarity of the Marks**

"Similarity of the marks is tested on three levels: sight, sound, and meaning . . . Each must be considered as they are encountered in the marketplace." AMF, Inc. v.

Sleekcraft Boats, 599 F.2d 341, 351 (9th Cir. 1979). "Where products are in direct competition, the degree of similarity required to prove a likelihood of confusion will be less than in the case of noncompetitive products." Aveda, 706 F. Supp. at 1429. Fox contends that its use of the word "Splash" along with "SLUG-A-BUG" makes the two marks distinct. In some contexts, it is conceivable that nearly identical words can be deemed dissimilar, but not here.

The labels in this case appear very similar. The labels for both South/Win and Fox's windshield wiper fluid have the phrase "SLUG-A-BUG" written in white, all capitalized letters across the middle of a square label. (Affidavit of Kevin J. Moran ¶¶ 2-3, Exs. A, B.) Both labels also have a picture of a bug in a circle with a line through the bug.[1] (Id.) The addition of the word "Splash" on Fox's label and the different colors used on the labels is not enough to make the labels dissimilar when compared to the striking similarity of the largest and most prominent phrase on the label. Based on these facts, the Court determines that this factor weighs in favor of establishing a likelihood of confusion.

### c. Degree to Which the Products or Services Compete

The products in this case are in direct competition with each other. Both South/Win and Fox use the mark on the windshield wiper fluid that they attempt to sell to the same national chain stores. This factor favors a finding of a likelihood of confusion.

---

[1] The bugs are different in the two labels. (Id.)

**d. Intent to Pass Off Goods as Product of Another**

"An inference of an intent to trade upon [South/Win's] good will arises if [Fox], with knowledge of [South/Win's] mark, chose a mark similar to that mark from the infinite number of possible marks." Aveda, 706 F. Supp. at 1429. It is undisputed that Fox was aware of South/Win's mark when it chose to use the mark itself and in fact chose to use the mark jointly with South/Win in an attempt to sell to national retailers. Based on the record before it, it appears that South/Win will be able to establish that Fox intended to trade on the goodwill of the mark, and that this factor favors a finding of a likelihood of confusion.

**e. Evidence of Actual Confusion**

It is the likelihood of confusion that serves as a test for infringement, not actual confusion. South/Win is, therefore, not required to prove any instance of actual confusion. Aveda, 706 F. Supp. at 1430. Neither party has introduced any evidence of actual confusion in the marketplace.

**f. Possibility of Eliminating Confusion by Purchaser**

"Confusion is more likely to occur in situations where the services or goods are relatively inexpensive because consumers typically exercise less care when making such choices than when choosing more expensive goods or services." Woodroast Systems, Inc. v. Restaurants Unlimited, Inc., 793 F. Supp. 906, 915 (D. Minn. 1992). The relevant

consumer in this case, however, is not the individual retail purchaser but large corporate entities. Those entities are well aware of who they are purchasing from and are not easily confused by the mark on the label. (Badzin Aff. ¶ 16.) Based on the record presently before it, this factor militates against a finding of a likelihood of confusion.

Taking, then, all of the elements of infringement together, the Court finds South/Win has established a probability of success on the merits of its trademark infringement claim.

**B. Threat of Irreparable Harm**

The second element South/Win must establish to obtain a preliminary injunction is that it will suffer irreparable injury if an injunction is not granted. Irreparable harm may be presumed "from a finding of probable cause in proving likelihood of success." Calvin Klein Cosmetics Corp. v. Lenox Laboratories, Inc., 815 F.2d 500, 505 (8th Cir. 1987). While South/Win has not established that Fox's use of the mark will result in lost sales, the Court concludes that there is a substantial risk of irreparable harm to South/Win's business reputation by Fox's continuing use of its trademark in a manner that causes the public to believe that Fox is affiliated with South/Win. This harm is amplified, and not diminished, by the fact that the two parties used to operate under the joint marketing arrangement. Such a risk of harm is sufficient to warrant granting preliminary relief.

**C. Balance of Harms**

The third element which must be established by a party moving for a preliminary injunction is that the harm to the moving party outweighs the financial loss and damage to the reputation of the nonmoving party. "Where the moving party has made a substantial investment developing its trademark relative to the nonmoving party's investment in the allegedly infringing mark, the courts generally find that the moving party's hardship outweighs that of the nonmoving party." Aveda, 706 F. Supp. at 1431.

Fox contends that its extensive advertisement of the product, coupled with the cost of complying with an injunction, means that the balance of harm factor weighs in its favor. Fox, however, knowingly advertised and produced a product using a mark that it did not own. Any hardship caused by the preliminary injunction may justly fall on the party that consciously decided to dress its goods for the market in a manner "so near to [a] successful rival that the public may fail to distinguish between them." Florence Mfg. Co. v. J.C. Dowd & Co., 178 F. 73, 75 (2d Cir. 1910).

The Court, therefore, finds that the balance of harms weighs in South/Win's favor.

**D. Public Interest**

The final factor considered in determining whether a preliminary injunction should be issued is the public's interest. This factor involves balancing the interest of protecting the public from confusion and society's interest in a competitive market. Aveda, 706 F. Supp. at 1431-32. It appears likely that South/Win will ultimately establish that Fox's

mark is confusingly similar to its mark and that misrepresentations of origin are being made in the marketplace. The Court, therefore, finds that the public interest favors injunctive relief.

After considering the Dataphase factors, the Court concludes that the grant of a preliminary injunction is warranted.

**Conclusion**

Accordingly, **IT IS HEREBY ORDERED** that Defendant's Motion for a Preliminary Injunction is **GRANTED**[2] as follows:

1. Fox, its servants, agents, employees, representatives, and all others acting by or under them are prospectively enjoined from reproducing, copying, or otherwise using in any way the phrase "SLUG-A-BUG" in connection with the manufacture or sale of windshield wiper fluid. This injunction does not prohibit Fox from selling their remaining inventory of windshield washer fluid that was packaged and labeled prior to March 23, 2001, with the "SLUG-A-BUG" mark. Fox is enjoined, however, from using any labels bearing the "SLUG-A-BUG" mark that are not currently affixed to bottles of windshield washer fluid and said labels should be destroyed.

---

[2] The request for injunctive relief in the form of a recall of previously shipped product will be denied.

2. South/Win shall post a bond in the amount of $25,000 to secure this Preliminary Injunction. In lieu of a bond, plaintiff may post cash or its equivalent with the Clerk of Court.

Dated: December 18, 2001

Richard H. Kyle
United States District Court Judge